*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DALANIUS MONTELL JONES JR.,

Defendant-Appellant.

UNPUBLISHED
September 16, 2025
11:15 AM

No. 348214
Saginaw Circuit Court
LC No. 18-045226-FC

Before: WALLACE, P.J., and RIORDAN and REDFORD, JJ.

PER CURIAM.

Defendant appeals by right his jury conviction of first-degree criminal sexual conduct (CSC-I) (sexual penetration involving victim less than 13 years of age and defendant 17 years of age or older), MCL 750.520b(1)(a) and MCL 750.520b(2)(b). The trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to serve 30 to 50 years' imprisonment. Defendant appeals by right, arguing that his constitutional right to the assistance of counsel was violated because his trial counsel provided ineffective assistance. We affirm.

## I. FACTS

The victim in this case was a six-year-old child. The victim and her mother lived with defendant in a house, in Saginaw, that was leased by defendant and the victim's mother, who were in a relationship. One night, while the victim's mother was working, defendant woke the child from sleep and forced her to perform oral sex on him. The victim testified that, during the assault, defendant told her to "stop biting" and that the sexual assault stopped because she would not stop biting defendant's penis.

During the trial, defendant argued that the alleged assault could not have happened because he was not in Michigan at the time, and he called three witnesses who testified that he was in Nashville, Toledo, and Saginaw at various times during the period of time when the assault was alleged to have occurred. Defendant also took the stand on his own behalf and testified that he did not assault the victim. When asked why the victim would accuse him of assaulting her, defendant said that he did not know; however, his counsel argued that the child fabricated the story after she

-1-

was confronted with a sexually explicit entry she made in her diary, which occurred subsequent to an incident in which she had been caught by her mother watching pornography on a cell phone.

After his conviction, defendant moved for a new trial or, in the alternative, requested that the court hold a *Ginther*[1] hearing, on the basis of ineffective assistance of counsel. Defendant's arguments centered around the contention that his trial counsel did not sufficiently investigate the extent of his disabilities arising out of his paraplegia, or present evidence to the jury regarding that condition, which arose out of a 2007 spinal injury suffered by defendant as a result of a gunshot wound. More specifically, defendant argued that his counsel did not subpoena his medical records from Covenant Hospital or the physician who treated him following the spinal injury, and also chose not to subpoena that physician for trial. Had defense counsel taken those steps, defendant argued, evidence would have shown that defendant had no feeling anywhere "in or on his body below his nipple line, and that he could not possibly have felt any biting sensation on his penis."[2] Further, defendant argued that counsel did not ask him questions, during direct examination at trial, about his lack of feeling below the nipple line or his lack of feeling on or in his penis. Finally, defendant argued that he could prove that he was prejudiced by his trial counsel's alleged ineffectiveness because there was a reasonable probability that the outcome of his trial would have been different if counsel had presented this evidence because it would have shown: "(1) with a lack of feeling in or on his penis, [defendant] did not have any physical sensation of pleasure when engaging in a sexual act, so he would have no motivation to commit a sexual act; and (2) it was impossible for [defendant] to feel a biting sensation on his penis, so he would never have told the alleged victim to 'stop biting'." The trial court granted defendant's motion for an evidentiary hearing.

The *Ginther* hearing took place over the course of three days. On the first day, in February 2020, the court heard testimony from defendant's trial counsel. Trial counsel was asked whether he had discussions with defendant about the extent of his injuries and whether he was paralyzed. Trial counsel testified that he and defendant had discussed it and, more specifically regarding the paralysis, he said, "I mean, it was pretty obvious, he's in a wheelchair and, I don't recall reviewing any medical records or anything. We talked about it, but, we did touch base about it. . . . [M]y understanding was that he was paralyzed from the waist down." Trial counsel suggested that defendant decided his main defense would be to argue that he had an alibi, i.e., that he was not in the vicinity of the victim's house when the incident was alleged to have happened, and that he flatly denied that the incident had ever occurred. When asked why he had not consulted with doctors regarding this case, or requested funding approval (to hire a medical expert), trial counsel said that was not part of their strategy and defendant never indicated he was impotent. "As a matter of fact, he had been living with the child's mother for eight years or something like that, and he never made any indication to me that he couldn't have sex." But trial counsel acknowledged they never pursued the issue of whether defendant could feel anything on his penis. Counsel also conceded that defendant's alibi defense was incomplete, because defendant could not account for every date within the relevant time span; however, they intended to rely upon a photograph that

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] The "nipple line" to which defendant refers is, essentially, the area of his body from the toes to a horizontal line across his body that intersects with the nipples on his chest.

defendant believed was supportive of the theory that the incident had not occurred. The photograph depicted defendant, family members, and the victim, who was smiling—a fact they hoped would demonstrate that the child was not afraid of defendant, even though it was taken after the incident was alleged to have occurred (i.e., because defendant was alleged to have assaulted the child, and threatened her not to tell anyone, the fact that she was smiling while taking a picture with defendant suggested that she was not afraid of him, according to defendant). When asked if the outcome of the trial would have been different if he had pursued the theory related to defendant's complete lack of sensation below the nipple line, trial counsel opined that it would not have made a difference because the case came down to a credibility contest between defendant and the victim, and that the jury believed the victim over defendant. He likewise believed that examining the victim about the biting issue could have offended the jury because "it gets them thinking about him committing this sex act with this girl, I thought it best just to leave it alone, in light of everything else we had. Leave it alone. I thought nothing would be gained by it." Finally, on the topic of obtaining medical records or asking defendant questions about his medical condition in front of the jury, trial counsel said defendant did not ask him to pursue it.

Following the testimony of defendant's trial counsel, defendant's current counsel informed the court that funding had been secured to have defendant examined by a neurologist and that they intended to present testimony from the neurologist via deposition.

On the second day of the hearing, in February 2024, Defendant was the only person who testified live, but the court noted that it had reviewed the transcript of the deposition of defendant's neurological expert, along with attachments to the transcript.[3]

Upon direct examination, defendant testified that he became paralyzed from the nipple line down in 2007, as a result of the shooting incident. He said he could not feel his legs or his genitals and that he has never regained any feeling in those areas since the gunshot wound. He further testified about multiple surgeries he has undergone since the shooting, including removal of the bullet, a procedure on his hips, and a procedure to address a wound from a pressure sore, and said he had not felt any pain pertaining to those matters. He also testified about developing an infection in his testicle, around 2011, as a result of taking what he referred to as a "sex pill." He said his testicle was surgically removed, but he had suffered no pain regarding the testicle before or after the surgery. He testified that he took medication to gain an erection and also used a ring to maintain it. When asked why he would have sex if he could not feel anything while doing so, he said he has sex to please his partner. He said he would not be able to feel anything if his penis was in someone's mouth and would not be able to feel any biting. When asked why he never talked about his paralysis at trial, he said he "tried to go that route, but [my lawyer] told me that it would be detrimental to my case. He told me that it wouldn't do nothing for me and we just stay on the path that we was on." He said he disagreed with that assessment, but did not want to blurt out anything

---

[3] The four year delay between the first day of the hearing in February 2020, and second day of the hearing in February 2024, was caused by the COVID-19 pandemic, which began shortly after the first day, as well as the time it took for defendant's expert neurologist to examine defendant in prison and have his deposition taken.

about his medical condition while testifying because he thought he could get in trouble for "speaking out of turn."

At that point in the hearing, defense counsel asked the court to allow defendant to demonstrate how he inserts in a catheter to illustrate that he does not show any signs of pain when doing so; however, the court denied the request and said defendant could testify about the issue. Defendant testified that he cannot feel the urge to urinate, so he inserts the catheter every two to three hours. He said his trial counsel had never asked him whether he could feel someone biting his penis. Defendant was also questioned about an incident in which he broke his femur while performing range of motion exercises, which led to the surgical implantation of a steel rod in his leg. He testified that he experienced no pain regarding his broken leg or the surgery.

Upon cross-examination, defendant was confronted with various medical records from time spent incarcerated with the Michigan Department of Corrections (MDOC) indicating that he had some sensation restored to his legs and had complained of pain below the waist on multiple occasions, but he denied ever making such statements.

The neurologist testified, in his deposition, that he examined defendant in December 2022, that defendant was unable to feel a pin prick from chest level to his toes, including the penile and groin area, and that he was also unable to feel vibrations in those areas.[4] The neurologist also described two tests he conducted to evaluate the presence of reflexes in the thigh/groin area and the abdominal area—he said that defendant's reflexes were absent during both tests. While the neurologist said that people with upper thoracic spinal injuries can have partial sensation in the groin-penile area, he opined that this was less likely in defendant's case, based on his examination. He opined that, since 2007, defendant had complete paralysis from the mid-chest down, including both lower extremities, trunk and abdomen, and that there was loss of sensation in this region. He also opined that defendant's condition had not improved since then. Upon cross examination, the neurologist said that he had read various medical records pertaining to defendant, agreed that there were multiple reports in those records of defendant complaining of pain in his lower extremities (in 2013 and 2019), and said that he was not aware that defendant had been in a sexual relationship with the victim's mother.

On the third day of the *Ginther* hearing, in May 2024, the trial court admitted defendant's medical records from MDOC as evidence, after hearing testimony from a records custodian. The court then provided the parties with 30 days to submit supplemental briefing.

In August 2024, the trial court issued an opinion and order denying defendant's motion for a new trial and defendant now appeals.

## II. STANDARD OF REVIEW

Defendant argues on appeal that trial counsel provided ineffective assistance because he failed to fully investigate defendant's paralysis, failed to use defendant's lack of sensation below

---

[4] The neurologic used a safety pin for the pin prick test and a tuning fork for the vibration test.

the nipple line to impeach the victim's testimony, and failed to argue that he had no motive to carry out the assault.

The determination of whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "Any findings of fact are reviewed for clear error, while the legal questions are reviewed de novo." *Id*.

The United States and Michigan constitutions both guarantee criminal defendants the right to counsel, and this includes the right to the effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. See *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012) (recognizing that the right to counsel encompasses the right to the effective assistance of counsel). To establish a claim of ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). There is a strong presumption that defense counsel provided effective assistance. *Strickland*, 466 US at 689. "Counsel is not ineffective for failing to advance a meritless position or make a futile motion." *People v Henry (After Remand)*, 305 Mich App 127, 141; 854 NW2d 114 (2014). A defendant asserting a claim of ineffective assistance of counsel has the burden of establishing the factual predicate of the claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## III. ANALYSIS

### A. TRIAL COUNSEL'S PERFORMANCE

In the present case, defendant's trial counsel testified that the strategy of presenting an alibi defense came from defendant. He said, from their very first meeting, defendant insisted that the alleged incident could not have happened because he was in Nashville, or somewhere else, during the subject timeframe. As previously mentioned, he further testified that they discussed the possibility of impeaching the victim on the issue of biting in light of defendant's paraplegia, but chose not to so because he did not want the jury thinking about defendant committing this sex act with the child. Instead, his strategy was to argue that the incident never happened by focusing on the fact that the child had previously been caught watching pornography and had then been found to have written in her diary about a fantasy involving oral sex with a boy from school, i.e., suggesting that the victim fabricated the incident as a reaction to being questioned about these matters by her mother.

Trial counsel always owes a duty to their client "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52. Defense counsel conceded that he made no attempt to subpoena defendant's medical records or to present his physician as a witness. The record is mixed as to whether such a decision by trial counsel was reasonable in the instant case. In support of that decision, we point to defense counsel's testimony, at the *Ginther* hearing, indicating that defendant never focused on the issue pertaining to his disability. Defense counsel testified that defendant instead focused on alibi testimony and documentation supporting the fact that he was in Nashville and Toledo during much

of the timeframe when the incident was alleged to have occurred, and his argument that the alleged incident never actually happened (which he believed was corroborated by the group picture that included him and the victim, taken long after the date of the purported incident, in which the victim is smiling, i.e., purportedly unafraid of him). Trial counsel's decision not to cross examine the victim about the issue of biting, due to the risks stated above, was certainly reasonable. But, under these facts, where trial counsel knew that defendant was a paraplegic, we question whether he exercised reasonable professional judgment when deciding to forego investigation into defendant's medical records doctors. See *Trakhtenberg*, 493 Mich at 52-53. However, as discussed below, we need not determine that issue because we find that there is no reasonable probability that the outcome would have been different but for trial counsel's allegedly deficient performance.

## B. NO REASONABLE PROBABILITY OF A DIFFERENT OUTCOME

Defendant's ineffective assistance of counsel argument is premised upon his assertion that he had no sensation below the nipple line, meaning that he could not have felt the sensation of being bitten anywhere below the waist, and likewise would not have been motivated to sexually assault anyone because he had no sensation in his genitals. However, defendant's assertion is directly contradicted by his own medical records from MDOC, which were admitted as evidence during the *Ginther* hearing in this case, and which indicate that he did, in fact, have sensation below the nipple line from 2012, until as recently as April 2022, i.e., more than three years after his February 2019 jury trial.

Defendant was previously incarcerated, which included portions of 2012 and 2013. His MDOC medical records from October 2012 state that he reported his back and buttocks were painful from time to time and that he "does have minimal sensation on his lower extremities and is able to feel pinching above the ankles." The medical record for the ensuing visit with a nurse in November 2012 states that defendant underwent surgical removal of a bullet in his thoracic spine, one year earlier, with increased sensation and movement to the lower extremities. In a request for a medical appointment, in November 2013, defendant communicated that he had leg pain and wanted stronger medication. Three days later, he was seen by a nurse, reporting "I was doing my exercises and I pulled something in my leg. It hurts to touch and move." The nurse's notes state that his left inguinal ligament was rubbery, distinct and "tender and painful to touch or move," and that defendant complained of pain to the left inner thigh. Defendant's pain was reported as sharp and "6/10." The nurse referred defendant to a doctor due to "chronic back/hip/leg pain, multiple back/hip surgeries [and] no relief from [over the counter medication]." Medicals record from the following month, December 2013, said that the pain was improving, but also said that his "lumbar spine has tenderness," and that he reported leg spasms and pain. An MDOC medical record from March 2014 said defendant has "[p]ain in lower back and legs." The medical history portion of a medical record from August 2014, again noted that, after the bullet removal, defendant had "regained some sensation on the legs." He was being seen that day because he wanted to change his medication from naproxen sodium to acetaminophen, due to stomach irritation.

Records from defendant's most recent incarceration likewise contain multiple references to defendant feeling pain below the nipple line. For example, a medical appointment request by defendant in April 2019, just two months after his conviction in this case, stated "I have a [sic] old bedsore that is starting to hurt me." A medical record from August 2019 indicated that defendant

had a leg blister that was painful. A record from January 2022 said defendant's left knee was aching and throbbing and defendant reported that it "hurts really bad." Defendant rated his pain as "8/10." His left knee was reported by the nurse to be swollen and, upon examination, it was warm to the touch.

In support of his argument, defendant points to evidence of a fractured femur he suffered in December 2022 that required surgery with internal fixation. The records pertaining to the diagnosis and treatment of the femur fracture indicate that defendant did not feel pain or have any sensation in that area. However, the fact that defendant reported no pain in December 2022 does not negate the fact that he repeatedly reported pain below the nipple line between 2012 and early 2022, a timeframe that would have included the date of the sexual assault.

Regarding defendant's argument as to the issue of motive, although evidence of motive may be relevant to certain issues in a criminal sexual conduct case, e.g., *People v McLaughlin*, 258 Mich App 635, 666; 672 NW2d 860 (2013), it is not an element of CSC-I.

In summation, defendant cannot show that there is a reasonable probability that a different outcome would have occurred at trial, had his counsel made the argument about his having no feeling below the nipple line, because the 2012-2013 medical record evidence presented to the jury would have been replete with statements made by defendant rebutting his argument. Had the trial court granted defendant's motion for new trial, the prosecution would have been able to present even more evidence rebutting defendant's argument, including the statement he made to MDOC medical staff in 2022, when he said his swollen knee "really hurts," and when he reported his pain as being an eight on a scale of 10. Thus, defendant has not met his burden under *Hoag* and *Trakhtenberg*, because he has not shown that, but for trial counsel's allegedly deficient performance, a different result would have been reasonably probable. See *Hoag*, 460 Mich at 7; *Trakhtenberg*, 493 Mich at 51, 55-56. As a result, we cannot conclude that the trial court erred when it denied his motion for new trial.

Affirmed.

/s/ Randy J. Wallace
/s/ Michael J. Riordan
/s/ James Robert Redford